**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| HARSCO CORPORATION, | : | No: _____ |
| | : | |
| Plaintiff, | : | Judge _____ |
| | : | |
| v. | : | JURY TRIAL DEMANDED |
| | : | |
| CLYDE KIRKWOOD and | : | ELECTRONICALLY FILED |
| EDW. C. LEVY CO., | : | |
| | : | |
| Defendants. | : | |

---

## COMPLAINT

---

Plaintiff, Harsco Corporation ("Harsco"), alleges upon knowledge as to itself

and its own actions and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.    This case arises from the misappropriation of confidential and

commercially sensitive business documents by a disloyal senior employee, who

surreptitiously passed some of them to a competing company for which he

subsequently went to work, and who passed other documents to a consultant for

another competitor.  Harsco seeks injunctive relief, as well as actual and punitive

damages, against both the employee, defendant Clyde Kirkwood ("Kirkwood")

and the competitor for which he went to work, defendant Edw. C. Levy Co. ("Levy").  The consultant to the second competitor that received information improperly is located in the United Kingdom, and relief with respect to European parties is being sought in parallel proceedings commenced by Harsco in England.

2.      Kirkwood was an employee of Harsco and its predecessor companies since 1991.  Until his abrupt resignation on June 3, 2014, Kirkwood was a trusted and valuable Harsco employee, serving most recently as Chief Technology Officer of Harsco's Metals & Minerals division ("Harsco M&M"), and then, in connection with a promotion received in April 2014, as Vice President, Commercial for Harsco M&M.

3.      Unbeknownst to Harsco, almost three months prior to his resignation – on March 15, 2014 – Kirkwood accepted a job offer from and signed an employment agreement with Levy, a company that Kirkwood has acknowledged is a Harsco competitor.

4.      Over the next three months, Kirkwood stayed on the job without informing Harsco that he had taken employment with a competitor, and breached his fiduciary duty of loyalty to Harsco by passing Harsco's trade secrets and confidential and proprietary business information to the Chief Operating Officer of his new employer Levy.  Worse, he accepted the promotion to Vice President, Commercial – a more senior position that gave him access to even more

confidential information – a month after accepting the Levy position.  Kirkwood

also, again while holding himself out as a loyal Harsco employee, provided his

new employer Levy and its COO with analyses of business opportunities that

Harsco was interested in, as well as information concerning Harsco's internal

deliberations about those projects.  Additionally, Kirkwood passed along to Levy

information about potential opportunities that had come to Harsco's attention to

bid for customer work, thereby permitting Levy to try to usurp those opportunities

from Harsco.  Making matters worse, he actively discouraged Harsco from

pursuing opportunities he had passed on to Levy.

   5.  In addition, Kirkwood clandestinely passed trade secrets and

confidential and proprietary business information to another third party:  former

Harsco President and Vice Chairman Geoffrey D H Butler, who retired from the

company over four years ago and became an industry consultant.  Having left the

company long ago, Butler has no right to and no need for any current information

about Harsco's business.  The email traffic between them that Harsco uncovered

after Kirkwood's departure reveals that starting at least as early as February 2014,

Kirkwood improperly disclosed secret and commercially sensitive information to

Butler, who is serving as a consultant to another company (referred to as

Competitor B) that is seeking to build a business competitive to Harsco.  The

information was shared expressly so that Butler could help Competitor B in

particular dealings adverse to Harsco.  Indeed, following the disclosure of Harsco's information to Competitor B, it approached Harsco seeking to take advantage of the improperly obtained information.

6.      The email correspondence between Kirkwood and Butler also reveals that Kirkwood and Butler are using the information to try to set up a further potential business transaction adverse to Harsco in 2015.

7.      None of these potential transactions were approved by or solicited by Harsco, and Kirkwood had no right to leak Harsco's information to competitors so they could try to use it for their own economic gain.

8.      On June 3, 2014, Kirkwood abruptly resigned from his position at Harsco and, in clear violation of his contractual non-compete obligation,[1] went to work for Levy, still in the possession of many of Harsco's confidential documents. Kirkwood's theft of Harsco's proprietary information and dissemination of that information to competing companies and their consultants has damaged and

---

[1]      Kirkwood is a UK citizen.  His employment agreement with Harsco is governed by English law and contains a choice of forum clause requiring contract claims to be heard solely in the courts of England.  Butler is also a UK citizen, and is resident in England.  Harsco is commencing parallel proceedings in England against Butler and, with respect to Kirkwood, to seek to enforce that contractual covenant.  This litigation is limited to the tort claims, including the violation of the Pennsylvania Uniform Trade Secrets Act, concerning acts that occurred in Pennsylvania.

threatens continuing irreparable damage to Harsco, and gives those competitors an unfair and unjust advantage in a challenging business environment.

9.     Accordingly, Harsco brings this action seeking: (a) a preliminary and permanent injunction prohibiting Kirkwood and Levy from using or disclosing Harsco's information in any manner, ordering them to return all such information and purge it from their records and computer systems, and preventing employees who had access to such data from participating in competitive bidding about those projects; and (b) damages arising from Kirkwood's improper disclosure of Harsco's confidential proprietary information and trade secrets to Levy and Butler.

## THE PARTIES

10.     Plaintiff Harsco Corporation is a Delaware corporation with its principal place of business in Camp Hill, Pennsylvania.  Its shares are publicly traded on the New York Stock Exchange.  Harsco provides logistical and environmental support services and engineering products to a variety of heavy industries worldwide.  Harsco operates in three segments, including its Metals & Minerals business, which provides on-site outsourced services to steel mills and other metal producers.  Its services include slag processing; semi-finished inventory management; material handling; scrap management; in-plant transportation; fertilizer products; and various other products and services including minerals and recycling technologies, environmental solutions for metals

and mining customers' waste streams, granules for asphalt removing shingles, and abrasives for industrial surface preparation derived from coal slag.  The Metals & Minerals business is a critical part of Harsco's value – and a critical driver of value for Harsco's public shareholders – accounting for 47% of the company's revenues in 2013 and an even larger share in 2014.

11.     Defendant Kirkwood is a citizen of the United Kingdom who has been working for Harsco and its affiliates and predecessor companies since 1991.  In 2010, he was seconded t.o Harsco M&M in Pennsylvania.  He is in the United States on a special work visa and has not been granted permanent resident status by the United States.  His local residences during the period of his secondment have been in Enola and Mechanicsburg, Pennsylvania, and his current address is 1931 Monterey Drive, Mechanicsburg, Pennsylvania 17050.

12.     Defendant Edw. C. Levy Co. is a Michigan corporation with its principal place of business at 9300 Dix Avenue, Dearborn, Michigan 48120.  Levy offers steel mill services, such as slag processing, scrap yard management and scrap processing, asphalt mixes and pavements, fertilizer, and environmental testing services, and has locations and operations both in the United States and in Europe, Australia, and Asia.  Levy regularly solicits business in Pennsylvania and, as detailed below, took actions in Pennsylvania and specifically aimed at parties in

6

Pennsylvania to obtain Harsco's confidential information and harm Harsco's business.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties and the matter in controversy, exclusive of interest and costs, exceeds $75,000.

14.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to these claims occurred in this District and Kirkwood resides in this District.

## FACTUAL BACKGROUND

### Kirkwood's Employment at Harsco

15.     In September 1991, Kirkwood accepted a job in London as an Industrial Engineer and Project Manager for MultiServ International Limited ("MultiServ").  In August 1993, Harsco acquired MultiServ, whose operations were combined with the Company's Heckett Division ("Heckett").

16.     Following the acquisition, Kirkwood became a trusted and valuable employee, responsible for leading Heckett's expansion into the fastest growing steel markets, China and India.  Over the years, he repeatedly executed a series of policy acknowledgements recognizing his duty to maintain the confidentiality of

Harsco's information.  He also accepted appointments as a director of nine Harsco subsidiaries between 2004 and 2011, which carries with it additional fiduciary duties to Harsco, the shareholder of the companies on whose boards he serves.

17.    In 2004, Kirkwood was promoted to the position of Regional Director, Asia Pacific, Middle East, and Africa.  At that time, he executed a service agreement (the "2004 Service Agreement").  Under the 2004 Service Agreement, Kirkwood agreed to be bound by an Employee Innovation and Non-Disclosure Agreement (the "2004 Non-Disclosure Agreement") and acknowledged that he was bound by the Harsco Corporation Code of Conduct (the "Harsco Code of Conduct").

18.    The 2004 Non-Disclosure Agreement stressed the importance of protecting Heckett, along with its subsidiaries and affiliates (collectively, the "Harsco Group") against disclosure of proprietary technical and non-technical information to the Harsco Group's competitors.  Accordingly, Kirkwood agreed that he would not disclose during or subsequent to his employment, any of the Harsco Group's proprietary information to which he had access.

19.    Under the 2004 Non-Disclosure Agreement, Kirkwood also agreed that he would not "remove or retain" and, upon the termination of his employment with the company, would "promptly deliver to the Company, all drawings, blueprints, manuals, letters, notes, notebooks, records, reports and all other

material relative to services or work performed at the Company or which is of a secret, confidential or proprietary nature relating to the Group's business and which are in the possession or control of Employee."

20.     The Harsco Code of Conduct stated that the protection of Harsco's property is "essential to the Company's well-being" and accordingly proscribed improper uses including "unauthorized personal appropriations or use of Harsco assets, data, or resources, including computer equipment and software; modifications, destruction, or disclosure of data; and bribes, kickbacks, or illegal payments."

21.     The Harsco Code of Conduct advised employees that unauthorized disclosure of Harsco's valuable proprietary information "could eliminate its value to Harsco [and] also give unfair advantage to others."

22.     The Harsco Code of Conduct also explicitly stated that:

> Proprietary information includes copyrights and trade secrets *as well as sensitive or private technical, financial and business information*. It includes records, practices, letters, plans, drawings, and computer programs. It may concern new development projects, marketing plans, rate or cost data or customer negotiations. Any copyrightable work written by and inventions created by Harsco employees within the scope of their employment are the sole and exclusive property of Harsco. Access to proprietary information is limited to those having a need to know. Any disclosure to others … must be in conformance with Company policies. *There is a continuing fiduciary duty to Harsco for each employee*

> ***to maintain the confidentiality of proprietary
> information both during and after employment.*** Harsco
> will take all appropriate actions to protect its proprietary
> information from improper disclosure.

(emphasis added).

23.     In January 2010, Kirkwood accepted a secondment to the United

States as Chief Technology Officer of Harsco M&M, an unincorporated business

division of Harsco based in Pennsylvania.  The transfer was effected by an

overseas assignment agreement (the "Secondment Agreement") between Kirkwood

and MultiServ Group Limited, one of Harsco's English subsidiaries.  The

Secondment Agreement supplemented, but did not supersede, the 2004 Service

Agreement and 2004 Non-Disclosure Agreement.  Indeed, the Secondment

Agreement stated that Kirkwood's employment would continue to be governed by

previously executed documents including the Harsco Code of Conduct.  However,

the Secondment Agreement reinforced the importance of confidentiality by

containing an additional broad confidentiality clause of its own.

24.     As Chief Technology Officer of Harsco M&M, Kirkwood performed

a critical role as the highest ranking executive in Harsco M&M's technology

department and reported directly to the President of Harsco M&M.  In this senior

position, Kirkwood had high level access to Harsco's trade secrets and confidential

business and proprietary information, including Harsco's nonpublic financial

results, forecasts, and asset values, as well as trade secrets in the field of finding alternative usages for by-products in the steel industry.  He was a regular participant in high level management and strategy meetings, and a recipient of numerous commercially sensitive and confidential internal reports about the business.

25.     In April 2014, he accepted a promotion to Vice President, Commercial – an even more senior position that gave him access to even more strategic information.  In particular, from January to June 2014, Kirkwood had access to data about a particularly important corporate initiative affecting the Harsco M&M business.  This included highly detailed information about steps Harsco is taking to improve the profitability of the Harsco M&M business.  Indeed, in 2014, Kirkwood was one of the top 100 employees in the entire Harsco organization, which comprised approximately 12,300 employees as of year end 2013.

**Kirkwood's Sudden Resignation**

26.     On June 3, 2014, despite being subject to an employment agreement with a six-month notice period and a six-month non-compete provision, Kirkwood unexpectedly resigned his position at Harsco and informed the president of Harsco M&M that he was going to work for Levy.  At that time, he returned his Harsco-

owned laptop computer, iPad and smart phone, and provided the passwords to those devices.

27.     Pursuant to Harsco's Management of IT Assets Policy, which Kirkwood, as former Chief Technology Officer, was aware of, "All information stored on Harsco personal computing assets is the property of Harsco Corporation and is subject to review."  In light of Kirkwood's departure for a competitor, Harsco retained computer forensic specialists to analyze the information on the devices that Kirkwood had returned. The results were shocking.

**Improper Disclosures to and Work for Levy**

28.     In early 2014, Kirkwood began discussions with Levy about possible employment with Levy.

29.     Kirkwood communicated with Levy by using his (or his wife's) personal email account (kirkwoodtribe@gmail.com).

30.     On January 20, 2014, Kirkwood emailed S. Evan Weiner ("Weiner"), Levy's Chief Operating Officer, stating that he is "[v]ery interested in Levy after our last conversation regarding the ability of managing from the UK."

31.     As Kirkwood admitted in a February 11, 2004 email to a personal friend, Levy is one of Harsco's competitors.

*a.  USM Project*

32.     Although its investigation continues, Harsco has already determined that, in a clear violation of his fiduciary and other duties to Harsco, Kirkwood used his personal email account to pass Harsco's confidential and proprietary trade secrets and other information to Levy's COO.  Worse still, between January and March 2014, Kirkwood not only passed along to Levy confidential information regarding a particular business opportunity in Israel, but then he took the extraordinary step of shutting down Harsco's efforts to pursue that opportunity so that Levy would not face competition from Harsco.

33.     Specifically, on January 28, 2014, Harsco employee Daniel Shaw sent Kirkwood an email inquiring whether Harsco was still interested in bidding on a project involving United Steel Mills Ltd. (USM).  USM is a steel mill located in Israel that had indirectly solicited Harsco as a potential bidder to provide slag clean-up services for USM.

34.     Kirkwood replied that, "As this will most likely be a 2015 capex item, we would still be interested."  (At the time, due to the number of near term projects on which it was already working, Harsco M&M was limiting its pursuit of opportunities that would require substantial capital expenditures in 2014 but no such restriction was in place for 2015 expenditures.)

35.     On February 2, 2014, when (without Harsco's knowledge) he was in the middle of negotiating his new employment at Levy, Kirkwood emailed Weiner

at Levy and attached the USM request for proposal, referred to as "tender documents." In so doing, Kirkwood improperly disclosed to Harsco's competitor that there was a particular business opportunity with USM on which Harsco had been focused.

36.     On March 2, 2014, after having secretly sent the USM tender documents to Levy, and after having previously reaffirmed to his colleague at Harsco that Harsco would be interested in the project, Kirkwood shut down Harsco's pursuit of the project, telling Shaw, "I do not think we have the resources to pursue this opportunity." That was untrue. Because the project called for capital expenditures only in 2015, there was no resource constraint preventing Harsco from pursuing the project.

### b. Tata Project

37.     In February 2014, Harsco M&M was engaged in confidential discussions concerning services it could provide to Tata Steel, a company based in India with operations in the steel, composites, power generation, and oil and gas industries.

38.     On February 10, 2014, Kirkwood emailed Weiner at Levy, informing him: "My travel plans have changed a little as I will not be in India the week commencing 17th February. The manangement [sic] team will be involved in discussions with Tata on the [name redacted] project."

39.   This email communicated to Levy not only the fact that Harsco was in active discussions with Tata, but also the specific project the two parties were discussing.  This was particularly sensitive information to share with Levy because Levy has its own relationship with Tata and was specifically identified in internal Harsco communications as a likely competitor for that new project on which Harsco wanted to bid.

### c.  *Kirkwood Secretly Takes a Job at Levy*

40.   Shortly after these inappropriate and improper disclosures of Harsco's confidential business information, on March 6, 2014, Levy offered Kirkwood a job as Vice President, International Operations for the Levy Group, with minimum first year compensation of $420,000 (including a signing bonus).  On March 15, 2014, Kirkwood accepted the offer from Levy in writing.

41.   Kirkwood did not inform Harsco of the existence of the offer or of the fact that he had accepted employment at competitor Levy.  Instead, he kept that relationship secret for another three months, continuing to participate in high level meetings at Harsco, and continuing to receive commercially sensitive and confidential proprietary information about Harsco's business, all of which gave him and Levy – on whose behalf he was really working – an inappropriate and unfair advantage.

42.     Had Harsco been aware that Kirkwood had accepted an offer of employment from a competitor, Harsco would have terminated his employment or placed him on "garden leave," a provision under his 2004 Service Agreement that allows Harsco to require Kirkwood to stay at home for six months while continuing to draw salary, but keeps him isolated from the business and prevents him from accessing confidential or sensitive documents or interfering with business opportunities.

43.     In April 2014, Kirkwood moved from the position of Chief Technology Officer to that of Vice President, Commercial at Harsco M&M and received an increase in compensation. He took this job – and Harsco's money – despite having already delivered a signed acceptance to Levy for the new competing position a month earlier.

44.     As Vice President, Commercial, Kirkwood continued to benefit from very high-level access to Harsco's most confidential business and proprietary information, including trade secrets.

45.     In his new position, Kirkwood continued to breach his fiduciary duties to Harsco, and held multiple calls in April 2014 with Levy's COO, including on April 11, 2014 and April 15, 2014, the subjects of which Harsco has not yet been able to determine.  However, based on all the surrounding circumstances, Harsco believes that discovery will confirm that Kirkwood improperly passed confidential

business and proprietary information, including trade secrets, to Levy COO Weiner during these April 2014 calls.

### d. Other Opportunities Communicated to Levy

46.     In May 2014, Kirkwood continued to breach his duty of loyalty to Harsco – by whom he was still employed – by providing Levy analyses of potential business opportunities in Northeast Brazil and Oman.

47.     On May 1, 2014, Kirkwood emailed Levy COO Weiner:  "Evan, sorry I missed you call [sic].  Back Friday and will call you between 7 am and 8 am if convenient.  **_Have some projects we maybe interested_** ibut will discuss on Friday[sic; emphasis added]."

48.     On May 2, 2014, Kirkwood sent Weiner a detailed email in which he described three business opportunities for his new employer Levy.

(a)     First, he described a project to construct a new steel mill (a "greenfield project") in Northeast Brazil known as the Companhia Siderurgica de Pecem ("CSP").  Kirkwood proposed that Levy make a $40-$50 million investment in the project (the "CSP Project").

(b)     Second, he described a project in Oman.  Kirkwood wrote:  "If you are interested in the Middle East, there is maybe an opportunity to introduced you to an influential Omani and a FerroChrome project" (the "FerroChrome Project").

(c)     Third, he noted that Harsco had been told of a particular

business opportunity involving a competitor of both Harsco and Levy that might be

available to be pursued by the end of the second quarter of 2014.

49.     The CSP Project is a new project that Harsco had been in discussions

with a joint venture partner about pursuing.  While Kirkwood told Levy, in the

course of trying to encourage Levy to pursue the project, that Harsco was not

interested in the project, there were pieces of the project that Harsco in fact was

very interested in pursuing.  Indeed, it was actively discussing internally and with

its potential joint venture partner their plans to move forward on aspects of the

engagement.  Kirkwood was simply trying to divert this opportunity to his new

employer because Levy has only a small market presence in Brazil, whereas

Harsco has a far more significant presence.  As Kirkwood knew, Levy had every

reason to want to develop new business in Brazil at Harsco's expense, and the

information and comments Kirkwood provided to Levy violate his duties to Harsco.

50.     In addition, Kirkwood never passed on to Harsco management his

observations about the opportunity in Oman, again diverting that information and

opportunity to his new employer Levy.

51.     On June 3, 2014, Kirkwood finally resigned from Harsco to work for

Levy.  Even then, he did not reveal that he had actually accepted his Levy offer

three months earlier.  Nor did he admit that he had disclosed Harsco's confidential

information and trade secrets to Levy.  All of that had to be ferreted out by Harsco with detective work over the ensuing days and weeks.

52.     Astonishingly, as appalling as Kirkwood's behavior with Levy was, that was not the half of it.

**Improper Disclosure of Confidential Information
to Another Competitor and Its Consultant**

53.     Geoffrey D H Butler is a former Vice Chairman and board member of Harsco who worked for the company from 1993 until his retirement in December 2010.  During his long tenure at Harsco, he served as Group CEO of both Harsco M&M and Harsco's Infrastructure business, and ultimately became the company's President.

54.     As a former Harsco President and Vice Chair of its board, Butler is well aware of the importance of maintaining the confidentiality of Harsco's business strategies, plans, and trade secrets.  Indeed, Butler's own employment agreements with Harsco contained broad confidentiality requirements, and it was Butler who, on behalf of Harsco's UK affiliate, countersigned Kirkwood's 2004 Service Agreement binding him to non-disclosure and non-compete obligations for the company's protection.

55.     Following his retirement from Harsco, Butler became a consultant to businesses in the industry.  Among his clients is Competitor B.

56.     In January 2014, Kirkwood began using his personal gmail account to pass Harsco's trade secrets and confidential and proprietary information to Butler, including sensitive internal Harsco financial projections and results.

57.     This information was provided to Butler knowing it would be shared with Competitor B, and with the intent and purpose of giving Competitor B an unfair competitive advantage against Harsco M&M in potentially negotiating two particular transactions, both of which Kirkwood and Butler discussed as possible transactions for Competitor B to pursue.

58.     On January 12, 2014, Kirkwood emailed Butler, stating that he will bring Butler "information on the coal projects and some numbers for [redacted Harsco M&M business unit] (2014 Plan)."

59.     Harsco's [redacted business unit] (2014) Plan is a highly confidential document containing internal cash flows, asset values, and forecasts for a particular Harsco M&M business operation.

60.     On February 21, 2014, Butler emailed Kirkwood, stating that he was "spending time with [Executive C]," and that "the [Competitor B] initiatives that do look promising [sic]."  He then asked Kirkwood if there was a good time that weekend to call for a catch up.  Executive C is the recently hired group head of business development for Competitor B, who was tasked with expanding

Competitor B's international operations, including to develop businesses to compete with Harsco.

61.     On March 31, 2014, Butler emailed Kirkwood about Harsco's operations in a particular country, stating: "I can confirm that [Competitor B] would be interested to [pursue the transaction adverse to Harsco]. I believe the proposition would be to buy the assets [in that country], have the contracts assigned and transfer the operating team. I think that [Competitor B] would want Harsco to wind up the Harsco company [in that country] and take responsibility for any residual liabilities, etc. I am not sure where Harsco [Local Subsidiary] office is located and I doubt whether [Competitor B] would want all the admin people or the office – but this could be negotiated."

62.     Butler went on to acknowledge the fact that Kirkwood had already disclosed to Butler the net book value of the particular Harsco assets being targeted, which is not public information and is only available from confidential internal financial reports. He asked that Kirkwood provide Butler with even more sensitive internal Harsco financial information so that he could pass it along to Competitor B to facilitate their analysis: "Of course the Q1 operating results [for Local Subsidiary] versus plan and prospects for the rest of the year would be a key indicator to valuation. ***I believe you indicated the NBV of the assets was around $[redacted]M – naturally [Competitor B] would want all the asset details and the***

*chance to inspect the equipment.*  I suspect some of the units NBV might be greater than market value.  Finally, the contract portfolio would need to be clarified and of course the acceptance of the customer to have the contracts assigned accordingly.  *It would be really helpful if you could give me a heads up on any of the above so that I can prepare the ground with [Competitor B]* so that when it comes to a formal dialogue the deal should flow quite smoothly from both parties' viewpoints." (emphasis added).

63.    In that same email, Butler also proposed that "[Competitor B] – Levy and [an outside source of capital] could organize [a specific transaction against] Harsco Metals and Minerals next year."

64.    Kirkwood neither had, nor ever sought, authorization from Harsco to discuss any potential transaction involving Harsco M&M or any of its business units or assets with Butler or any other third party.

65.    The very next day (April 1, 2014), Kirkwood responded to Butler by writing "will get you additional information later, but this list should help."  The "list" is a spreadsheet containing very detailed site by site financial information for 2013 and 2014, affecting sites at numerous locations around the world.  It shows not only the financial performance by customer by site, but includes detail on Harsco's return on investment capital, and actual and projected revenue associated

with each site.  Under no circumstances should this information have been disclosed to any third party, let alone a consultant who is working for a competitor.

66.    The volume of material Kirkwood illicitly provided was, by his own admission, enormous.  On April 6, 2014, Kirkwood emailed Butler stating that he had "a large package (too big to email) with the information" Butler had requested in his March 31, 2014 email.  The contents of the "large package" are not apparent from the email, but from all the surrounding circumstances, Harsco believes that discovery will confirm that the package contained confidential and sensitive business information belonging to Harsco.

67.    On May 2, 2014, Kirkwood emailed Butler a document entitled "[Local Subsidiary] prices.pdf," which contained Harsco's internal financial analysis used to bid for work at several steel mills operated by Customer D. Customer D is a large worldwide manufacturer of steel, and a customer of Harsco M&M.  The spreadsheet sent to Butler included site by site information on pricing, anticipated revenues, capital investment, gross profit and internal rates of return.

68.    The "[Local Subsidiary] prices.pdf" document is highly confidential, contains sensitive information concerning Harsco's financial performance and competitive pricing, and under no circumstances should have been disseminated to any outside party.

69.    That same day he was communicating with Butler about Harsco's operations at that particular Local Subsidiary, Kirkwood accessed six other documents concerning the operations of that Local Subsidiary, including details about "price reviews" and the Customer D relationship.  Computer logs show that these six documents were all accessed within 90 seconds of one another, suggesting that they were copied *en masse*.

70.    On May 9, 2014, Kirkwood emailed Butler the publicly available slide deck used in connection with Harsco's Q1 2014 earnings call.

71.    On May 19, 2014, Butler emailed Kirkwood a list of questions seeking details of internal Harsco business meetings and additional ***non-***public information concerning the financial results of Harsco's operations at the particular Local Subsidiary the two of them had previously spoken about:

> 1. What was the outcome of Friday's meeting?
> 2. What were the [Local Subsidiary's] quarter results versus plan?
> 3. What is the forecast S/GP for the rest of the year for [the Local Subsidiary]?
> 4. What is the current contract life on each [Local Subsidiary] contract?  Has [a particular contract] been renewed?
> 5. Was any value expressed on Friday if Harsco were to [pursue a particular transaction affecting the Local Subsidiary]?  How does this compare to asset NBV?

72.    Butler added that there would be a Competitor B board meeting on Wednesday, May 21, 2014 "and it would be helpful to have any info available

about [the Local Subsidiary]."  Butler also asked for the "the current level of $/tonne invoiced across all contracts for 2014 in Harsco."

73.    None of the information Butler sought is publicly available, as both he and Kirkwood well knew from their many years at Harsco and their own contractual non-disclosure obligations.  And the request for "the current level of $/tonne invoiced across all contracts for 2014 in Harsco" effectively asked for Harsco's average contract price across the entire company.

74.    Later that day, in utter disregard for his fiduciary and other obligations to Harsco, Kirkwood provided Butler detailed responses to each question.  These responses included information about Harsco's internal deliberations as to the possibility of pursuing a specific transaction involving the Local Subsidiary in question.  They also included that Local Subsidiary's quarterly results, Harsco's going-forward business plan with respect to those assets, and specific responses as to the Local Subsidiary's contract life, tonnes served, and expected revenues. Kirkwood also wrote that he would provide Butler additional information later.

75.    On May 23, 2014, Butler emailed Kirkwood to "update [him] on the status of [Competitor B]."  Butler indicated that he attended a Competitor B board meeting where the board approved pursuing a transaction adverse to Harsco. Butler also sought Kirkwood's "guidance" on drafting an email to Harsco to set up a meeting.  Further to Butler's plan to engineer a transaction adverse to Harsco

M&M by Competitor B and Levy with the participation of an outside source of capital, Butler added that the Competitor B board "also supported a dialogue with Levy for mutual strategic benefit and wanted to talk to you about a potential place and timing for [Executive C] to meet Evan [Weiner of Levy] – probably not before you are on board with Levy or certainly with you present."

76.     On May 28, 2014, Kirkwood emailed Butler a confidential analysis (labeled "CONFIDENTIAL") of the revenue and adjusted EBITDA of Harsco M&M and another competitor.  This document was prepared by a party with detailed high level knowledge of the Harsco's finances, is highly confidential, and contains sensitive information concerning Harsco's financial performance, as well as sensitive information about a potential contractual counterparty, and under no circumstances should have been disclosed to any third party, let alone a consultant to a competitor.

77.     As a direct result of Kirkwood's unlawful and improper misappropriation of an extensive array of Harsco's highly confidential and proprietary trade secrets, and his provision of that information to Butler, on June 18, 2014, Competitor B (specifically, Executive C) sent Harsco M&M a letter proposing one of the transactions that Kirkwood and Butler had been discussing. In the letter, Executive C wrote that he had "become reasonably familiar with your

organization, so I hope you will accept that this is not a cold call, but a well considered approach."

78.     Competitor B's familiarity with Harsco's organization is not just the result of public information and industry knowledge, but a direct result of Kirkwood's breach of fiduciary duty and misappropriation of confidential information and trade secrets, and has placed Harsco at an irreparable competitive disadvantage with respect to any response to Competitor B's overture.

## COUNT I –VIOLATION OF PENNSYLVANIA TRADE SECRETS ACT
### (Against All Defendants)

79.     Harsco repeats and realleges the allegations of paragraphs 1 through 78 as if fully set forth herein.

80.     As detailed above, Harsco's trade secrets include, without limitation, Harsco's confidential non-public financial information, information about future potential business combinations and business strategies, bids submitted to and negotiations with prospective or existing customers, and research and development efforts.

81.     These trade secrets are extremely valuable to Harsco, and would be of great value to its competitors, as demonstrated by the eagerness with which Levy and Butler sought them.

82.     Harsco's trade secrets were kept secret by Harsco, were not generally known or available to persons outside of Harsco, and are critical to the success of Harsco's business.

83.     Harsco took reasonable security measures to maintain the secrecy and confidentiality of its trade secrets.  In addition, it promulgated policies requiring the preservation of secrecy and included express confidentiality obligations in Kirkwood's own contracts.

84.     As described above, Kirkwood and Levy misappropriated Harsco's trade secrets by acquiring such trade secrets through improper means and improperly disclosing and using such trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act, 12 P.S. § 5301 *et seq*.

85.     As a direct and proximate result of Kirkwood's and Levy's wrongful conduct, Harsco has suffered and will continue to suffer incalculable financial loss (well in excess of $75,000), loss of the confidentiality of its trade secrets, loss of goodwill and other damages.

86.     Harsco has no adequate remedy at law.

87.     Kirkwood and Levy have acted willfully and maliciously towards Harsco, entitling Harsco to recovery of double damages under 12 P.S. § 5304 and recovery of its reasonable attorney fees under 12 P.S. § 5305

## COUNT II -- BREACH OF FIDUCIARY DUTY

### (Against Kirkwood)

88.     Harsco repeats and realleges the allegations of paragraphs 1 through 87 as if fully set forth herein.

89.     At all relevant times, Kirkwood owed a duty of loyalty to Harsco, and was required to exercise the utmost good faith and undivided loyalty to Harsco in the performance of his duties.

90.     By the conduct described above, Kirkwood breached his duty of loyalty to Harsco, by, among other things:  (a) failing to act solely for Harsco's benefit during his employment; (b) improperly using Harsco's facilities and property to promote his personal interests and further Levy's business; (c) improperly using and divulging and communicating Harsco's trade secrets and other confidential, proprietary information to third parties; (d) assisting Butler in a scheme to permit Competitor B to prepare an unfairly competitive proposal against Harsco by improperly and without authorization providing Butler with Harsco's trade secrets and other confidential proprietary information; (e) failing to return to Harsco its confidential and proprietary information and trade secrets upon his resignation from Harsco.

91.     As a direct and proximate result of Kirkwood's wrongful conduct, Harsco has suffered and will continue to suffer incalculable financial loss (well in

excess of $75,000), loss of the confidentiality of its proprietary business information and trade secrets, loss of goodwill and other damages.

92.    Kirkwood has acted willfully and maliciously towards Harsco.

93.    Harsco has no adequate remedy at law.

## COUNT III – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Levy)

94.    Harsco repeats and realleges the allegations of paragraphs 1 through 93 as if fully set forth herein.

95.    At all relevant times, Kirkwood owed a duty of loyalty to Harsco, which he breached as set forth above.

96.    Levy knew that Kirkwood owed a duty of loyalty to Harsco.

97.    Despite this knowledge, Levy knowingly and substantially induced and assisted Kirkwood in breaching his duty of loyalty to Harsco, including by agreeing to pay him hundreds of thousands of dollars as he sat in Harsco's offices as a double agent, having secretly accepted employment at Levy, and feeding Levy information about opportunities that Harsco otherwise could potentially have pursued.

98.    Levy knowingly profited from Kirkwood's breach of his fiduciary duties to Harsco.

99.     As a direct and proximate result of the wrongful conduct of Levy, Harsco has suffered and will continue to suffer incalculable financial loss (well in excess of $75,000), loss of the confidentiality of its proprietary business information and trade secrets, loss of goodwill and other damages.

100.    Levy has acted willfully and maliciously towards Harsco.

101.    Harsco has no adequate remedy at law.

## COUNT IV – UNJUST ENRICHMENT

### (Against all Defendants)

102.    Harsco repeats and realleges the allegations of paragraphs 1 through 101 as if fully set forth herein.

103.    Kirkwood and Levy were enriched by their misappropriation and use of Harsco's confidential proprietary information and trade secrets, including without limitation Harsco's non-public financial information, information about future potential business combinations and business strategies, bids submitted to and negotiations with prospective or existing customers, and research and development efforts.

104.    This information was obtained by Kirkwood and Levy improperly, for their own gain, and to the detriment and harm of Harsco.

105.    By virtue of the foregoing, Kirkwood and Levy may not retain any benefits derived from the confidential proprietary information and trade secrets

belonging to Harsco, and are liable to Harsco in an amount in excess of $75,000, exclusive of interest and costs, to be proven at trial.

## COUNT V – TORTIOUS INTERFERENCE WITH CONTRACTUAL AND BUSINESS RELATIONS

### (Against all Defendants)

106.    Harsco repeats and realleges the allegations of paragraphs 1 through 105 as if fully set forth herein.

107.    As described above, Harsco has contractual and or prospective contractual relationships with USM, Tata Group, CSP, and Customer D.

108.    Kirkwood and Levy were aware of these contractual and business relationships.

109.    Kirkwood and Levy intentionally and tortuously, with improper motive and without justification or excuse, interfered and/or are planning or attempting to interfere with those relationships for their personal gain, and to disadvantage Harsco.

110.    In addition, Kirkwood owed Harsco contractual duties of confidentiality not to reveal confidential Harsco information to outside parties, and particularly not to competitors such as Levy.

111.    Levy was aware of those contractual duties but agreed to pay Kirkwood hundreds of thousands of dollars knowing that Kirkwood would stay at Harsco for several months as a secret double-agent, passing it information about

Harsco's plans, strategies and opportunities, all in violation of his contractual duty of confidentiality.

112.   As a direct and proximate result of Kirkwood's and Levy's wrongful conduct, Harsco has suffered and will continue to suffer incalculable financial loss (well in excess of $75,000), loss of the confidentiality of its proprietary business information and trade secrets, loss of goodwill and other damages.

113.   Kirkwood and Levy have acted willfully and maliciously towards Harsco.

114.   Harsco has no adequate remedy at law.

## COUNT VI – UNFAIR COMPETITION

### (Against all Defendants)

115.   Harsco repeats and realleges the allegations of paragraphs 1 through 114 as if fully set forth herein.

116.   The wrongful conduct of Kirkwood and Levy more fully described above constitutes an unfair method of competition and/or unfair and deceptive acts or practices.

117.   As a direct and proximate result of Kirkwood's and Levy's wrongful conduct, Harsco has suffered and will continue to suffer incalculable financial loss (well in excess of $75,000), loss of the confidentiality of its proprietary business information and trade secrets, loss of goodwill and other damages.

118.    Kirkwood and Levy have acted willfully and maliciously towards Harsco.

119.    Harsco has no adequate remedy at law.

### REQUESTS FOR RELIEF

**WHEREFORE**, Harsco respectfully requests that the Court enter judgment:

a.      Temporarily, preliminarily and permanently enjoining Kirkwood, Levy and all persons or entities acting in concert with them from using in any way, directly or indirectly, or disclosing to any person or entity Harsco's confidential, proprietary and trade secret information;

b.      Temporarily, preliminarily and permanently enjoining Kirkwood, Levy and all persons or entities acting in concert with them to screen off from any ongoing work on matters as to which Kirkwood disclosed information any employee, agent or consultant who was given access to such information;

c.      Temporarily, preliminarily and permanently enjoining Kirkwood, Levy and all persons or entities acting in concert with them to immediately return any and all of Harsco's confidential, proprietary and trade secret information and directing that they are not to retain any copies thereof;

d.      Awarding Harsco its actual damages, in an amount in excess of $75,000 to be proven at trial;

e.      Awarding Harsco punitive damages in an amount to be proven at trial;

f.      Awarding Harsco its reasonable attorneys' fees, costs of suit and pre-judgment interest;

g.      Awarding Harsco such other and further relief as the Court deems just and proper.

### JURY DEMAND

Harsco demands a trial by jury of all issues so triable.

Respectfully submitted,

Date: June 30, 2014          */s/ Bridget E. Montgomery*

Bridget E. Montgomery (PA ID 56105)
ECKERT SEAMANS CHERIN & MELLOTT, LLC
213 Market Street, 8th Floor
Harrisburg, PA 17101
Tel: 717.237.6000
Fax: 717.237.6019
bmontgomery@eckertseamans.com

Peter L. Simmons (NY ID 2166502) (*pro hac vice* pending)
Lisa H. Bebchick (NY ID 4068300) (*pro hac vice* pending)
Yonatan Y. Jacobs (NY ID 4885893) (*pro hac vice* pending)
FRIED, FRANK, HARRIS, SHRIVER
  & JACOBSON LLP
One New York Plaza
New York, New York 10004-1980
Tel: 212.859.8000
Fax: 212.859.4000
peter.simmons@friedfrank.com
lisa.bebchick@friedfrank.com

*Attorneys for Plaintiff Harsco Corporation*

35

9487326